UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT BOSCH GmbH,

Plaintiff,

v.

HAYNES CORPORATION,
a Florida corporation; and
INTERSTATE DIESEL,
SERVICE, INC., d/b/a
INTERSTATE MCBEE,
an Ohio limited liability
company,

Defendants.

_____/

Case No. 1:05-CV-418

Hon. Richard Alan Enslen FILED
ECF DOCUMENT

I hereby attest and certify that this is a printed copy of a document
which was electronically filed with the United States District Court
for the Western District of Michigan on 9-22-05

RONALD C. WESTON, SR., CLERK OF COURT

By: _____ Dated: 9-23-05
        Deputy Clerk

**OPINION**

This is a patent lawsuit arising from Plaintiff Robert Bosch GmbH's United States Patent No.

5,155,461 ('461 patent) pertaining to "stators"–electromagnets used as part of electronic fuel

injection systems. (Compl. ¶ 22 & Ex. A.) The patent application was filed on February 8, 1991 and

the patent issued on October 13, 1992. (*Id.* ¶¶ 20-22.) The two defending corporations, Haynes

Corporation and Interstate Diesel Service, Inc., d/b/a Interstate McBee (Defendants "Haynes" and

"McBee") have moved to dismiss and/or transfer this suit to the Northern District of Ohio. Oral

argument is unnecessary.

## BACKGROUND

Plaintiff Robert Bosch GmbH (Plaintiff "Bosch") is a German Limited Liability Company

with a place of business at 4300 44th St., Kentwood, Michigan. (Compl. ¶ 1.) This is far from

Plaintiff's only place of business, though. According to its media, Plaintiff is one of the world's

largest private industrial corporations, with 242,000 employees, annual sales of $49 billion, and 80 business locations in North America, including one in the Northern District of Ohio. (Haynes' Mem., Exs. A & B.) By comparison, Haynes is a smaller, but still national business with its only corporate office in Naples, Florida, and its manufacturing facilities in Florida and California. (James Dixon Aff. ¶ 6.) A significant part of Haynes' business comes in the sale of re-manufactured diesel fuel injectors for use in locomotives. (Dixon Aff. ¶ 10.) Also, by comparison, McBee is a smaller, family-owned manufacturing business[1] with its only corporate and manufacturing facilities located in the Northern District of Ohio, but with other facilities in Florida, California, Denmark and Spain. (*Compare* Lawrence Graham Aff. ¶¶ 3 & 18 and G. Thomas Williams Aff. ¶ 16 & Ex. A.) In the Northern District of Ohio, McBee employs 150 persons, including its five member management team, all of whom reside in the Northern District of Ohio. (Graham Aff. ¶ 18.)

All three parties to this suit are engaged in the manufacture and sale of electronic fuel injection systems. In the mid-1990's, Defendant Haynes was a grant recipient from the State of Florida to develop a high pressure electronic common rail fuel injection system ("HPECR") to reduce fuel consumption and diesel emissions. (Dixon Aff. ¶ 15.) For this task they needed electronic stators, and they settled on a third-party, Kurz-Kasch, Inc. ("Kurz-Kasch"), located in Dayton, Ohio.[2] (*Id.* ¶¶ 13 & 16.) In 2002, Haynes sent a sample stator to Kurz-Kasch and sought

---

[1]McBee has calculated that its recent sales totaled 1/1000th the size of Bosch's sales, which is a significant distinction in terms of their commercial size. (McBee's Reply 10.)

[2]Of course, Dayton, Ohio is within the Southern District of Ohio, though close to the Northern District. That is, the Northern District of Ohio, which ends at the southern border of Auglaize County, is a drive of only approximately 57 miles on Interstate 75 from the City of Dayton. This is significant since, given Kurz-Kasch's alleged involvement, there is a large potential for a third-party indemnity claim/independent damage claim against it.

2

the availability of a non-infringing stator. (*Id.* ¶ 18.) In the fall of 2002, Kurz-Kasch provided samples and represented that while it could not provide Electromotive Division of General Motors solenoid ("EMD") stators from Diesel Technology Corporation ("DTC") since Bosch owned the tooling, it could re-design and manufacture a non-infringing stator. (*Id.* ¶¶ 20-21.)

As part of this plan, in the spring of 2003, James S. Dixon, President of Haynes, and Alfred Buesher of McBee, entered into a verbal joint venture agreement to purchase and own the tooling for the forthcoming Kurz-Kasch stators. (*Id.* at 23.) As part of this agreement, McBee and Haines were to make independent purchase orders so that competitors would not be wise to their volume of business in the stator aftermarket. (*Id.*) Under the terms of the joint venture, Haynes and McBee split the cost of tooling ($26,910) and the purchase orders were divided between Haynes and McBee. (*Id.* ¶¶ 29-31.) Further, as part of the joint venture, the stators were shipped from Kurz-Kasch's manufacturing facilities in Dayton, Ohio and delivered to Haynes in Florida, where they were incorporated into fuel injection units. (*Id.* ¶¶ 33 & 35.)

McBee made the first order of 1,000 units in late February or early March 2003. (*Id.* ¶¶ 25-26.) On March 6, 2003, McBee placed purchase order number 714746, which required non-infringing stators, the tooling for the stators. and a quantity of stators not to exceed 500,000 as determined by the joint venture's requirements. (*Id.* ¶ 28.)

Haynes later made two purchase orders from Kurz-Kasch as part of the joint venture. As part of the production, Kurz-Kasch agreed to develop non-infringing stators and further agreed to indemnify Haynes for any claims of patent infringement. The purchase orders resulted in the production of fuel injectors which Haynes shipped from Naples, Florida. (*Id.*) The units were produced for Alston Transport, which is headquartered in Chicago, Illinois and the units themselves

3

were sent to Alston's facilities in Alliance, Nebraska. (*Id.* ¶ 37.) Sporadic deliveries were sent to Peaker Services of Brighton, Michigan--within the Eastern District of Michigan. (*Id.*) No delivery of disputed stators was sent to any customer in the Western District of Michigan. (*Id.* ¶ 36.)

In the fall of 2004, the fun came to an end. Kurz-Kasch stopped supplying Haynes and McBee with stators because Bosch, Kurz-Kasch's largest customer, had complained about the sales and Kurz-Kasch had decided "not to fight." (*Id.* ¶¶ 40 & 42.) Haynes received notice from Bosch that Bosch was claiming patent infringement regarding the production and sale of the Kurz-Kasch stators. (*Id.* ¶ 43.) Kurz-Kasch then corresponded with McBee, as of February 23, 2005, to indicate that it was unable and unwilling to manufacture the requested stators. (*Id.* ¶ 44.) Haynes then followed with its own formal demand that Kurz-Kasch continue to manufacture the stators or, in the alternative, turnover the tooling necessary for non-infringing stator production. (*Id.* ¶ 45.) On June 10, 2005, Kurz-Kasch responded that it had reached a resolution with Bosch and had agreed that the stators previously sold to Haynes and McBee infringed the `461 patent. (*Id.* ¶¶ 46-48.)

This suit was then filed by Bosch in this District on June 25, 2005. The Complaint says precious little about the Western District of Michigan, except for the allegations in paragraphs 5 through 7 of the Complaint that on information and belief Haynes and McBee purchased components for fuel injectors from Bosch's Kentwood, Michigan production facilities. (Compl. ¶¶ 5-7.) The purpose of the purchase of these components (be it research, manufacturing, re-sale, *etc.*) is not specified in the Complaint. Bosch, however, elaborates in its Brief in Opposition and supporting affidavits. According to James Hagene, a long-term Bosch employee, Bosch developed its `461 patent at its Kentwood facilities. (Hagene Aff. ¶ 3.) The purpose of the invention was to minimize cracking of the stator under the high pressure atmosphere of diesel combustion. (*Id.*) Plaintiff also

4

discloses that Haynes Corporation has had a continuous business history with Bosch's Kentwood facilities. This relationship involved over 239 production shipments valued at over $372,000 for the period of 1998 to June 2005. Further, Haynes made overtures to Kentwood about a possible purchase of Bosch's Kentwood facilities, although these overtures then collapsed after Bosch indicated that the proposed sale would not include the '461 patent. (*Id.* ¶ 9.)

Along these same lines. Hagene has characterized McBee's relationship with Western Michigan as a continuous and systematic one. Hagene has said that McBee supplied products for Bosch Kentwood in 1998 and 1999. (Hagene Aff. ¶ 12.) McBee also purchased some 86 product shipments (over $140,000) from Bosch Kentwood between 1998 and June 30, 2005. (*Id.* & Ex. D.) Staff for McBee also attended product auctions and made bids at Bosch Kentwood in 1998 and 2003. (*Id.* ¶ 13.) McBee has also had other recent significant business relationships with businesses in Michigan. (*Id.* ¶¶ 16-17.) Four of McBee's managerial or technical staff also were part of contractual discussions regarding the possible purchase of Bosch Kentwood in late 2003. (Hagene Aff. ¶ 18 & Ex.s G & H.)

Hagene has affirmed. by information and belief, that Haynes uses Bosch stators in its injectors. (*Id.* ¶ 10.) Bosch has not, however, produced any cognizable evidence to this effect. Bosch had not made any statements about McBee's purchase or sale of infringing stators in Western Michigan. It recognizes that it is not required to offer such evidence in a patent action because federal statutes. 28 U.S.C. §§ 1391(c) and 1400(b), permit venue in a patent suit in any district wherein a defendant resides and residence is defined constructively for that purpose as equating with all judicial districts in which the defendant is subject to personal jurisdiction. *See VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1577 (Fed. Cir. 1990): *North Am. Philips Corp. v.*

*Am. Vending Sales, Inc.*, 35 F.3d 1576, 1577 n.1 (Fed. Cir. 1994). The record suggests that jurisdiction may be exercised over both McBee and Haynes in Western Michigan. However, it also suggests that jurisdiction may be exercised over Bosch in Northern Ohio, which is the more pertinent of the two points.

## LEGAL ANALYSIS

_____While the parties have fully briefed the issues of lack of venue and lack of personal jurisdiction, on the present record the Court finds that transfer of venue under 28 U.S.C. § 1404(a) is the most pertinent and compelling issue in terms of this legal analysis.

### 1. Standards for Change of Venue

Title 28 U.S.C. section 1404(a) provides:

 For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a).[3] This federal statute was enacted by Congress in 1948 to both codify and broaden the common law doctrine of *forum non conveniens*, which prior to the statute's adoption permitted such transfers upon a showing of inconvenience. *Norwood v. Kirkpatrick*, 349 U.S. 29. 32 (1955): *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235. 253 (1981). A decision to transfer under § 1404(a) lies within the sound discretion of the district court. *See Norwood*, 349 U.S. at

---

[3] A transferor court may only transfer to a venue as to which there is personal jurisdiction over the parties and where venue is proper. *See Hoffman v. Blaski*, 363 U.S. 335, 343-44 (1960). It appears to the Court that the Northern District of Ohio is such a venue (given the venue requirements of 28 U.S.C. §§ 1391 and 1400(b)) and given that all the parties appear to have sufficient contacts with the Northern District of Ohio to make the exercise of personal jurisdiction by it constitutional under the Due Process Clause. Certainly. were this not the case. the Court would have anticipated an objection on this ground, which has not been made. (*See* Haynes' Reply at 9.) Therefore, the Northern District of Ohio is an appropriate candidate for transfer under section 1404(a).

31-33. A plaintiff's choice of forum is ordinarily entitled to some weight, *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947), but not such weight as will favor a clearly disadvantageous forum, *see Thomas v. Home Depot*, 131 F. Supp. 2d 934, 937 (E.D. Mich. 2001).

In enforcing the statute, the district courts must consider both the private interests of the parties and their witnesses (under the statutory rubric of "convenience") and the public interest of efficient judicial administration (under the statutory rubric of "the interest of justice"). The private interests include, without limitation, "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gulf Oil Corp.*, 330 U.S. at 508-09 (discussing factors pertinent to *forum non conveniens* ). The public interests include, without limitation, docket congestion; the burden of trial within the particular jurisdiction; the value of holding trial within a community in which the affected public live; and the familiarity of the court with the controlling law. *Id.; see also Moses v. Business Card Express, Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991) (discussing factors pertinent to transfer under section 1404(a)); *Keboro v. Southwestern Clean Fuels Corp.*, 285 F.3d 531, 537 (6th Cir. 2002). The trial court must examine all pertinent factors and determine whether the factors weigh more heavily in favor of the moving party's venue or the existing venue. *Keboro*, 285 F.3d at 537.

### 2. Private Factors

As to the private factors, it is clear from the parties' briefing that the dominant private factors to be considered are the convenience of the parties, witnesses and counsel.

7

As to the parties themselves. the interests are somewhat balanced, though the balance tips in favor of the Northern District of Ohio. Some of Bosch's Kentwood engineering staff, including the patent inventors, are significant factual witnesses located within the Western District of Michigan. At the same time, though, all of McBee's pertinent staff are located in its facilities in the Northern District of Ohio. Haynes' pertinent staff members are located in Florida, which is a closer flight to the Northern District of Ohio than the Western District of Michigan, especially for those wishing to avoid the inevitable connections and plane flight delays for Western Michigan airports.

In terms of counsel, both Defendants routinely employ Ohio counsel and wish to avoid the costs of local counsel in the Western District of Michigan. Given Defendants' size relative to Bosch. this is a prudent and significant concern in terms of the overall fairness of the proceedings.

In terms of non-party witnesses, the above factual recitation makes clear that the resolution of this controversy will depend in no small part on the testimony of non-party witnesses–namely, the employees of Kurz-Kasch who manufactured the '461 stators for Bosch and the allegedly infringing stators for Defendants.[4] Those witnesses are subject to the subpoena power within the Northern District of Ohio because of the provisions of Federal Rule of Civil Procedure 45(b)(2) (allowing for subpoenas within "100 miles" and at any place within a state which is specified by the state court rules) and Ohio R. Civ. P. 45 and 4.6(A) (providing for statewide service of subpoenas and process within Ohio). Some of those witnesses may not be available for subpoena in the Western District of Michigan since Bosch's representations have not made clear that all such witnesses are likely to

_____

[4]As stated above, there is also the possibility that these witnesses will become party witnesses. should a third-party claim be filed. Of course, it is also possible that no third-party suit will be filed because the contestants are trying to preserve their relationships with Kurz-Kasch.

8

voluntarily appear in the Western District of Michigan. This is very important since such witnesses were at the center of the joint venture which caused the instant law suit and at the center of Bosch's stator production generally.

Overall, the Court finds that the private factors strongly favor a transfer of this suit to the Northern District of Ohio.

### 3. Public Factors

As to the public factors. the parties' briefing has mentioned, but not focused upon, the public factors pertinent to transfer. The documentary and physical evidence most pertinent to this suit is located primarily or close to the Northern District of Ohio, which is McBee's home and close to Kurz-Kasch's Dayton facilities. The docket statistics cited by the briefing indicate that both the Western District of Michigan and the Northern District of Ohio are busy districts. (McBee's Br. in Supp., 18 & n.3.) However, this snapshot misses some important points regarding docket congestion in the Western District in Michigan.

First, the weighted case filings for the year ending on September 30, 2004 indicate that Western District's filings are more work intensive–*i.e.*. the Western District had weighted case filings of 514 per judge as opposed to the Northern District which had 452 per judge for the same time period. (*Id.*) Reflective of this. the Western District took slightly more time to get cases to trial–24 months as opposed to 20.7 months. (*Id.*) However, the most pertinent statistic in terms of the comparable docket is the change in judicial staff since the statistics. Before changes, this District had four regular district judges. The Northern District had 12 regular district judges. Since then. the Northern District has had one judge take senior status. the Honorable David A. Katz. This Court has had one judge elevated. Honorable David W. McKeague, and two other judges announce senior

9

status or forthcoming senior status, the undersigned and the Honorable Gordon J. Quist. In fact, both Judge Quist and myself have been constrained to continue regular civil work notwithstanding hopes of future reduced assignments because of the demands of the Western District case load. In a word, although this Court understands the demands of the Northern District, this District is presently overburdened and likely to remain so until judicial vacancies are filled. This factor is another significant reason favoring transfer of venue, though the record supports transfer even apart from this circumstance.

## CONCLUSION

Overall, both the private and public factors pertinent under 28 U.S.C. § 1404(a) strongly favor a transfer of venue to the Northern District of Ohio. An Order shall issue for the Clerk to transfer this action forthwith.

DATED in Kalamazoo, MI:
September 22, 2005

/s/ Richard Alan Enslen
RICHARD ALAN ENSLEN
SENIOR UNITED STATES DISTRICT JUDGE